**RECORD NO. 16-11(L)**
**CONSOLIDATED W/16-12**

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

────────────────

MARCUS REYMOND ROBINSON;
TILMON C. GOLPHIN,

*Petitioners - Appellants,*

v.

EDWARD THOMAS, Warden,
Central Prison, Raleigh, North Carolina,

*Respondent - Appellee.*

────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

────────────────

## CONSOLIDATED OPENING BRIEF OF APPELLANTS

────────────────

David Weiss
Center for Death Penalty
Litigation
123 West Main Street,
Suite 700
Durham, NC 27701
(919) 956-9545 Tel.
dcweiss@cdpl.org

Donald H. Beskind
Duke University School of Law
Box 90360
210 Science Drive
Durham, NC 27708
(919) 613-7085
beskind@law.duke.edu

*Counsel for Appellant*
*Marcus Reymond Robinson*

Kenneth J. Rose
Center for Death Penalty
Litigation
123 West Main Street
Suite 700
Durham, NC 27701
(919) 956-9545 Tel.
ken@cdpl.org

Jay H. Ferguson
Thomas, Ferguson &
Mullins, LLP
119 East Main Street
Durham, NC 27701
(919) 682-5648
ferguson@tfmattorneys.com

*Counsel for Appellant*
*Tilmon C. Golphin*

**LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477**
**A Division of Lantagne Duplicating Services**

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ........................................................................... ii

JURISDICTIONAL STATEMENT ...............................................................1

ISSUES PRESENTED FOR REVIEW ..........................................................1

STATEMENT OF CASE ..............................................................................2

SUMMARY OF ARGUMENT ....................................................................19

ARGUMENT ...............................................................................................20

    I.    Petitioners' double jeopardy claim was exhausted when it was presented to and adversely decided by the state supreme court..........20

    II.    *Younger* abstention is not appropriate because, in the absence of federal review, there is a substantial likelihood Petitioners will suffer an irreparable double jeopardy violation ..................................26

    III.    Given that the designated trier of fact concluded that Petitioners were ineligible for the death penalty following a trial-like sentencing proceeding, the state supreme court erred under the Double Jeopardy Clause by remanding for resentencing proceedings that again could expose Petitioners to the death penalty ...............................................................................................34

CONCLUSION ............................................................................................42

REQUEST FOR ORAL ARGUMENT ........................................................42

CERTIFICATE OF COMPLIANCE ...........................................................44

CERTIFICATE OF SERVICE .....................................................................45

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Abney v. United States*,
431 U.S. 651 (1977)......................................................................27

*Arizona v. Rumsey*,
467 U.S. 203 (1984)...................................................36, 38, 39, 40

*Barrett v. Acevedo*,
143 F.3d 449 (8th Cir. 1998) .......................................................21

*Batson v. Kentucky*,
476 U.S. 79 (1986).........................................................5, 12, 13, 14

*Benton v. Maryland*,
395 U.S. 784 (1969)......................................................................35

*Bobby v. Bies*,
556 U.S. 825 (2009)......................................................................41

*Bullington v. Missouri*,
451 U.S. 430 (1981).................................................................*passim*

*Burks v. United States*,
437 U.S. 1 (1978)...........................................................................37

*Elmore v. Foltz*,
768 F.2d 773 (6th Cir. 1985) .......................................................24

*Evans v. Michigan*,
133 S. Ct. 1069 (2013).................................................................40

*Foster v. Chatman*,
136 S. Ct. 1737 (2016).................................................................14

*Furman v. Georgia*,
408 U.S. 238 (1972)......................................................................35

*Gilliam v. Foster*,
    75 F.3d 881 (4th Cir. 1996) ..................................................................*passim*

*Glossip v. Gross*,
    135 S. Ct. 2726 (2015)...................................................................29

*Golphin v. Branker*,
    519 F.3d 168 (4th Cir. 2008) .........................................................3

*Golphin v. North Carolina*,
    555 U.S. 975 (2008)........................................................................3

*Harrington v. Richter*,
    562 U.S. 86 (2011).......................................................................23

*Harrison v. Gillespie*,
    640 F.3d 888 (9th Cir. 2011) .......................................................34

*Jones v. Sussex I State Prison*,
    591 F.3d 707 (2010) ...............................................................21, 22

*McCleskey v. Kemp*,
    481 U.S. 279 (1987).......................................................................4

*Miller v. Alabama*,
    132 S. Ct. 2455 (2012).................................................................41

*Montgomery v. Louisiana*,
    136 S. Ct. 718 (2016)...................................................................41

*Murphy v. Com. of Va.*,
    896 F. Supp. 577 (E.D. Va. 1995) ...............................................31

*Nivens v. Gilchrist*,
    319 F.3d 151 (4th Cir. 2003) ....................................26, 30, 32, 33

*Nivens v. Gilchrist*,
    444 F.3d 237 (4th Cir. 2006) ..................................................32, 33

iii

*North Carolina v. Pearce*,
   395 U.S. 711 (1969)........................................................................35

*O'Sullivan v. Boerckel*,
   526 U.S. 838 (1999)........................................................................24

*Penry v. Lynaugh*,
   492 U.S. 302 (1989)........................................................................41

*People v. Anderson*,
   6 Cal. 3d 628 (1972) ......................................................................29

*Peters v. Kiff*,
   407 U.S. 493 (1972).........................................................................4

*Poland v. Arizona*,
   476 U.S. 147 (1986)........................................................................41

*Robinson, Augustine, Golphin, and Walters v. State of North Carolina*,
   No. 15-1397 (docketed in U.S. Supreme Court on May 17, 2016)................18

*Robinson v. Polk*,
   438 F.3d 350 (4th Cir. 2006) ..............................................................2

*Roper v. Simmons*,
   543 U.S. 551 (2005).........................................................................3

*Sattazahn v. Pennsylvania*,
   537 U.S. 101 (2003)..........................................................37, 38, 39, 41

*Shute v. Texas*,
   117 F.3d 233 (5th Cir. 1997) .............................................................24

*Slack v. McDaniel*,
   529 U.S. 473 (2000).........................................................................1

*Smith v. Digmon*,
   434 U.S. 332 (1978)........................................................................22

*Smith v. Kemp*,
   715 F.2d 1459 (11th Cir. 1983) ...................................................................25

*State v. Golphin*,
   352 N.C. 364 (2000) .......................................................................................2

*State v. Golphin*,
   358 N.C. 157 (2004) ...................................................................................2, 3

*State v. Robinson*,
   342 N.C. 74 (1995) .........................................................................................2

*State v. Robinson*,
   350 N.C. 847 (1999) .......................................................................................2

*State v. Whitehead*,
   365 N.C. 444 (2012) .....................................................................................29

*State v. Wilkerson*,
   232 N.C. App. 482 (2014) .............................................................................30

*State v. Williams*,
   345 N.C. 137 (1996) .......................................................................................3

*Stroud v. United States*,
   251 U.S. 15 (1915)........................................................................................35

*U. S. ex rel. Stevens v. Circuit Court of Milwaukee Cty., Wis., Branch VIII*,
   675 F.2d 946 (7th Cir. 1982) ..................................................................24, 31

*United States v. Mackins*,
   32 F.3d 134 (4th Cir. 1994) ..........................................................................22

*United States v. Scott*,
   437 U.S. 82 (1978)........................................................................................40

*Walck v. Edmondson*,
   472 F.3d 1227 (10th Cir. 2007) ....................................................................34

*In re Wright*,
__ F.3d __, 2016 WL. 3409851 (4th Cir. June 21, 2016) ...............................34

*Younger v. Harris*,
401 U.S. 37 (1971)..........................................................................18, 33

## STATUTES

28 U.S.C. § 1291 .............................................................................................1
28 U.S.C. § 2241 ...............................................................................1, 34, 35
28 U.S.C. § 2253 .............................................................................................1
42 U.S.C. § 1983 ...........................................................................................30

N.C. Gen. Stat. § 15A-1417 .........................................................................39
N.C. Gen. Stat. § 15A-1417(a) .......................................................................6
N.C. Gen. Stat. § 15A-1417(c) .....................................................................29
N.C. Gen. Stat. § 15A-1445(a) .....................................................................21
N.C. Gen. Stat. § 15A-2010 ......................................................................3, 37
N.C. Gen. Stat. § 15A-2011 ..................................................................3, 37, 38
N.C. Gen. Stat. § 15A-2012 ......................................................................3, 38
N.C. Gen. Stat. § 15A-2012(a) ...................................................................6, 38
N.C. Gen. Stat. § 15A-2012(a)(3) ...............................................................6, 38

## RULES

Fed. R. App. P. 4(a)(1)....................................................................................1
Fed. R. App. P. 22 ...........................................................................................1
Fed. R. App. P. 28(f) .......................................................................................3
N.C. R. App. P. 21 ........................................................................................25
N.C. R. App. P. 32(b)....................................................................................17
N.C. R. Evid. 706 ...................................................................................17, 22

## OTHER AUTHORITIES

Amanda S. Hitchcock, *Deference Does not by Definition Preclude Relief: The Impact of Miller-El v. Dretke on Batson Review in North Carolina Capital Appeals*, 84 N.C. L. REV. 1328 (2006)................................................5

Catherine Grosso and Barbara O'Brien, *A Stubborn Legacy: The Overwhelming Importance of Race in Jury Selection in 173 Post-Batson North Carolina Capital Trials*, 97 IOWA L. REV. 1531 (2012)...................................................................................................5

Equal Justice Initiative, *Illegal Racial Discrimination in Jury Selection: A Continuing Legacy* (2010) ..............................................................................5

Samuel R. Sommers, *On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations*, 90 J. PERSONALITY & SOC. PSYCHOL. 597 (2006) ....................4

## JURISDICTIONAL STATEMENT

Pursuant to 28 U.S.C. § 2241, the district courts had jurisdiction over the petitions for writs of habeas corpus separately-filed by Petitioners Robinson and Golphin. The district courts dismissed both petitions without prejudice, entering an order and judgment against Robinson on June 4, 2016, and against Golphin on June 7, 2016. App. 590-603, 644-56. Pursuant to Fed. R. App. P. 4(a)(1), Petitioners timely appealed from the district courts' final orders. App. 604, 657. This Court later consolidated Petitioners' cases on appeal. Docket Entry 13. The Court has jurisdiction over the appeal under 28 U.S.C. §§ 1291 and 2253.[1]

## STATEMENT OF ISSUES

I.     Petitioners' double jeopardy claim was exhausted when it was presented to and adversely decided by the state supreme court.

II.    *Younger* abstention is not appropriate because, in the absence of federal review, there is a substantial likelihood Petitioners will suffer an irreparable double jeopardy violation.

III.   Given that the designated trier of fact concluded that Petitioners were ineligible for the death penalty following

---

[1] The district court orders dismissing the petitions did not address the issuance of certificates of appealability. *See* App. 601, 655. Pursuant to 28 U.S.C. § 2253, Fed. R. App. P. 22, and Local Rule 22(a)(B), Petitioners request that the Court treat this brief as an application for a certificate of appealability, and issue a certificate to fully consider the issues presented. Petitioners note that Judge Floyd's dissenting vote to grant their prior emergency motions for stay or injunction pending appeal demonstrates that the issues are debatable by jurists of reason. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

a trial-like sentencing proceeding, the state supreme court erred under the Double Jeopardy Clause by remanding for resentencing proceedings that again could expose Petitioners to the death penalty.

## STATEMENT OF CASE

In 1994, Petitioner Robinson was convicted for the first-degree murder of Erik Tornblom and related crimes in state court in Cumberland County, North Carolina, and sentenced to death. Robinson's convictions and death sentence were affirmed on direct appeal. *State v. Robinson*, 342 N.C. 74 (1995), *cert. denied*, 517 U.S. 1197 (1996). Robinson sought post-conviction relief, which was denied by the state and federal courts. *State v. Robinson*, 350 N.C. 847 (1999); *Robinson v. Polk*, 438 F.3d 350 (4th Cir. 2006), *cert. denied*, 549 U.S. 1003 (2006).

In 1998, Petitioner Golphin was convicted for the first-degree murder of Trooper Lloyd E. Lowry of the North Carolina Highway Patrol and Deputy David Hathcock of the Cumberland County Sheriff's Department, and related crimes, in state court in Cumberland County, North Carolina, and was sentenced to death. Golphin's convictions and death sentence were affirmed on direct appeal. *State v. Golphin*, 352 N.C. 364 (2000), *cert. denied,* 532 U.S. 931 (2001). Golphin sought post-conviction relief, which was denied by the state and federal courts. *State v.*

*Golphin*, 358 N.C. 157 (2004); *Golphin v. Branker*, 519 F.3d 168 (4th Cir. 2008), *cert. denied, Golphin v. North Carolina*, 555 U.S. 975 (2008).[2]

On August 10, 2009, the North Carolina General Assembly enacted the Racial Justice Act, or RJA.  *See* N.C. Gen. Stat. §§ 15A-2010 to 2012; *see also* S.L. 2009-464.[3]  The RJA redefined eligibility for the death penalty, providing that no person whose judgment was sought or obtained on the basis of race could be sentenced to death.  N.C. Gen. Stat. § 15A-2010.  The statute specified various bases for proving race was a factor in the case and explicitly permitted defendants to use statistical evidence to make their case.  N.C. Gen. Stat. § 15A-2011.

---

[2] Both Robinson and Golphin were teenagers at the time of their crimes.  Robinson "had just turned eighteen years old . . . ."  *Robinson*, 438 F.3d at 353.  Golphin was 19 years old at the time of the crime.  *Golphin v. Branker*, 519 F.3d 168, 171 (4th Cir. 2008).  *Compare Roper v. Simmons*, 543 U.S. 551, 570, 574 (2005) (barring imposition of death penalty on offenders age 18 and younger; recognizing that "it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed;" and further recognizing that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18.").  Further, both Robinson and Golphin had co-defendants who were sentenced to life imprisonment.  Robinson's co-defendant Roderick Williams was tried capitally at a separate trial and sentenced to life imprisonment.  *State v. Williams*, 345 N.C. 137, 138 (1996).  Golphin's co-defendant was his brother Kevin Golphin, who was sentenced to death at the brothers' initial joint trial, but was later resentenced to life imprisonment pursuant to *Roper* because he was 17 at the time of the crime.  *Golphin*, 519 F.3d at 176, n. 5.
[3] The RJA statutes, as well as the subsequent amendment to the RJA enacted in 2012, and the repeal enacted in 2013, are attached to this brief as an addendum pursuant to Fed. R. App. P. 28(f).

In enacting the RJA, the North Carolina General Assembly made clear that the law of North Carolina rejects the influence of race discrimination in the administration of the death penalty. In so doing, the General Assembly accepted the challenge issued by the United States Supreme Court in *McCleskey v. Kemp*. Addressing the state legislatures, the *McCleskey* Court ruled that it was the duty of the states "to respond to the will and consequently the moral values of the people" when addressing the difficult and complex issue of racial prejudice in the administration of capital punishment. 481 U.S. 279, 319 (1987).

The North Carolina General Assembly had good reasons for enacting additional state law protections against racial bias in the administration of capital justice. In a state that is 35 percent non-white, almost half of North Carolina's death row inmates were sentenced to death by juries with no meaningful minority representation. At the time of Petitioners' RJA trials, 35 of the state's nearly 150 death row inmates were tried by all-white juries, and another 38 were sentenced by juries with only one African-American member. App. 199; *see also Peters v. Kiff*, 407 U.S. 493, 503-04 (1972) (noting that group-based exclusion of jurors "deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented."); Samuel R. Sommers, *On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations*, 90 J. PERSONALITY & SOC. PSYCHOL. 597

(2006) (finding that racially mixed juries engaged in longer deliberations, discussed a wider range of information, and were more accurate in their statements about the case).

What is more, the North Carolina appellate courts had notably failed to enforce the Supreme Court's directive in *Batson v. Kentucky*, 476 U.S. 79 (1986), that race may not play a role in jury selection. In the 30 years since *Batson*, North Carolina's appellate courts have decided over a hundred cases involving such claims and not once have they found even a single instance of discrimination against a minority juror. *See* Amanda S. Hitchcock, *Deference Does not by Definition Preclude Relief: The Impact of Miller-El v. Dretke on Batson Review in North Carolina Capital Appeals*, 84 N.C. L. REV. 1328, 1328 (2006); Catherine Grosso and Barbara O'Brien, *A Stubborn Legacy: The Overwhelming Importance of Race in Jury Selection in 173 Post-Batson North Carolina Capital Trials*, 97 IOWA L. REV. 1531, 1535 (2012).[4]

---

[4] The North Carolina courts' failure to enforce *Batson* is an outlier among southern states. A 2010 report issued by the Equal Justice Initiative, *Illegal Racial Discrimination in Jury Selection: A Continuing Legacy*, found significant numbers of *Batson* reversals across the South: over 80 in Alabama, 33 in Florida, 10 each in Mississippi and Arkansas, 12 in Louisiana, and 8 in Georgia. Among the states examined by EJI (which did not include North Carolina), only the Tennessee courts had never granted *Batson* relief in a criminal case. *See* EJI Report at p. 19 (report available at www.eji.org, by following links to "Race and Poverty" and then "Race and Jury Selection"). Furthermore, undersigned counsel's own review of *Batson* decisions in state appellate courts within the Fourth Circuit reveals that

The RJA established an adversarial procedure for defendants facing capital trials. In both trial and post-conviction cases, the RJA required trial courts to hold evidentiary proceedings and make factual findings about whether race was a significant factor. N.C. Gen. Stat. §15A-2012(a). It provided a right to a bench trial. For those defendants previously sentenced to death who prevailed at RJA proceedings, the RJA mandated "that the death sentence imposed by the judgment shall be vacated and the defendant resentenced to life imprisonment without the possibility of parole." N.C. Gen. Stat. § 15A-2012(a)(3). This stands in contrast to the law governing resolution of typical post-conviction claims, which does not require the judge to impose a specified punishment. *See* N.C. Gen. Stat. § 15A-1417(a) (setting forth relief available when state courts grant post-conviction motions).

In the event that a defendant is found ineligible for the death penalty under the RJA, and a life imprisonment sentence is imposed, the legislature provided no mechanism for appeal of the sentence.

Petitioners Robinson and Golphin filed timely RJA motions on or about August 6, 2010. They alleged they were ineligible for the death penalty because race was a factor in prosecutorial decisions to seek the death penalty, in the

---

North Carolina is the only such state that has never, in the thirty years since *Batson*, reversed a case because of discrimination against a juror of color.

exercise of peremptory strikes, and in jury decisions to impose the death penalty. App. 16, 234.

In March of 2011, Robinson filed a motion seeking an evidentiary hearing on his jury discrimination claims under the RJA. After consulting with the parties, the state trial court initially scheduled an evidentiary proceeding for September 6, 2011. About a month prior to the RJA trial, at the State's request, the trial court agreed to postpone the matter. The evidentiary proceeding was next scheduled for November 14, 2011. However, a few days prior to that date, the trial court granted another continuance request by the State and rescheduled the RJA trial for January 30, 2012. On the day the RJA trial was set to begin, the State lodged a third motion for continuance, which the trial court denied. App. 253-58.

Thus, on January 30, 2012, the state trial court in Cumberland County commenced an evidentiary proceeding in Robinson's RJA case. The proceeding dealt with the portion of Robinson's RJA motion alleging that prosecutors relied on race in their exercise of peremptory strikes during jury selection. App. 231.

The RJA trial lasted approximately two weeks, until February 15, 2012. It included detailed treatment of complex statistical and historical evidence from over 150 capital proceedings, including Robinson's. Seven expert witnesses testified at the proceeding, and the parties submitted over 170 exhibits. App. 231, 236-242, 274.

On April 20, 2012, the state trial court issued a 167-page memorandum order which included 370 findings of fact.  App. 231-397.  The trial court concluded that statistical disparities and intentional discrimination infected Robinson's trial, as well as the capital justice system in Cumberland County and in North Carolina, over a twenty-year period.  App. 392-97.  Among the trial court's findings of fact are the following specific findings:

- Of the 7,400 peremptory strike-eligible jurors in North Carolina capital cases between 1990 and 2010, prosecutors statewide struck 52.6% of eligible black venire members, compared to only 25.7% of all other eligible venire members.  The probability of this disparity occurring in a race-neutral jury selection process is less than one in ten trillion.  App. 286-88, ¶¶ 42, 46.  This disparity remained constant even when the data between 1990 and 2010 was examined in two ten-year sets, or four five-year sets.  App. 289-91, ¶¶ 51-57.

- In Cumberland County, where Robinson's trial took place, there were eleven capital jury selection proceedings during the twenty-year period examined.  In those eleven proceedings, the average rate per case at which prosecutors struck eligible black venire members was 52.69%, compared to only 20.48% of all other eligible venire members.  App. 293, ¶ 61.  In ten of the eleven cases, prosecutors struck black jurors at a significantly higher rate than other eligible venire members.  App. 296-97, ¶¶ 68-69.

- Robinson's jury was selected by prosecutor John Wyatt Dickson. Dickson participated in the jury selection of three capital cases, including Robinson's.  In those three cases, Dickson struck eligible black venire members at a significantly higher rate than other eligible venire members: Robinson (50% compared to 14.3%); John McNeill (60% compared to 13.6%); Jeffery Meyer (41.2% compared to 19%).  App. 297, ¶ 72.

- In Robinson's particular case, the prosecutor struck five of ten eligible black venire members, but only four of 28 other eligible venire members, for a strike rate of 3.5. The probability of this disparity occurring in a race-neutral jury selection process is only 3.6 in 100. App. 297-98, ¶¶ 72-73, 75.

- These statistical disparities persisted even after Robinson's experts controlled for non-racial factors that could influence the State's exercise of peremptory strikes, such as a venire member's expressed reservations on the death penalty or criminal history. The experts controlled for non-racial factors using two different statistical methods: cross-tabulation and logistic regression analysis. App. 301-18, ¶¶ 81-119.

In light of these racial disparities, the state trial court determined that Robinson was ineligible for the death penalty and entitled to a life imprisonment sentence. App. 397. The trial court entered a separate certified state court judgment vacating the death sentence and resentencing Robinson to life imprisonment without parole. App. 398-400. Following the entry of the trial court's order granting relief, Robinson was transferred from death row to another prison, and began serving his life imprisonment sentence.[5]

On July 2, 2012, the North Carolina General Assembly enacted amendments to certain evidentiary and procedural provisions of the RJA, but kept in place its retroactive application to all death row inmates, and its statutory mandate that a successful claim would result in vacatur of the death sentence and imposition of a

---

[5] The history of Robinson's sentence status may be found online at www.ncdps.gov by following these hyperlinks: About/Prisons/Death Penalty/Offenders on Death Row.

sentence of life imprisonment with no mechanism for appeal of that sentence. *See* S.L. 2012-136.[6]  Pursuant to this change in law, on July 3, 2012, Petitioner Golphin filed a timely amendment to his pending RJA motion.  App. 17.

On October 1, 2012, the state trial court held an additional RJA trial in the consolidated case of Golphin and two other death row inmates from Cumberland County: Christina Walters and Quintel Augustine.  App. 18.  Like Robinson's case, this RJA trial addressed allegations that race was a significant factor in decisions to seek and impose the death sentence when prosecutors relied on race in their exercise of peremptory strikes during jury selection.  App. 10.

The RJA trial conducted by the state trial court in the three joined cases lasted almost two weeks, and, like Robinson's trial, included detailed treatment of complex statistical and historical evidence from over 150 capital proceedings, including Golphin's.  App. 18, 55-106, 121-45, 162-88.  On December 13, 2012, the state court issued a 210-page memorandum order which included lengthy findings of fact.  The state court concluded that statistical disparities and intentional discrimination infected Golphin's trial, and again concluded that such disparities marred the capital justice system in Cumberland County and in North Carolina, over a twenty-year period.  App. 210-19.

---

[6] The RJA amendments are attached to the brief as an addendum.

In addition to the comprehensive statistical evidence presented in Robinson's RJA case, the proceedings involving Golphin, Walters, and Augustine uncovered substantial non-statistical evidence that prosecutors in Cumberland County had a practice of using race in jury selection. The evidence showed, and the state trial court found, that Golphin's prosecutor wrote racially-charged notes about potential black jurors, such as "blk. wino – drugs" or being from a "respectable blk family" or from a "blk/high drug" area in Augustine's case. A black venire member with a criminal history was described as a "thug," while white venire members with similar histories were noted only as being a "n[e'er] do well" or "fine guy." App. 59-63.

Prosecutors, including one of Golphin's prosecutors, relied on a "cheat sheet" of explanations to defeat *Batson* challenges, which was distributed at a prosecutor training program in the mid-1990s. The cheat sheet included a list of vague, pat explanations for striking jurors, such as body language or eye contact. App. 82-86, 230.

## BATSON Justifications: Articulating Juror Negatives

1. <u>Inappropriate Dress</u> - attire may show lack of respect for the system, immaturity or rebelliousness

2. <u>Physical Appearance</u> - tattoos, hair style, disheveled appearance may mean resistance to authority.

3. <u>Age</u> - Young people may lack the experience to avoid being misled or confused by the defense.

4. <u>Attitude</u> - air of defiance, lack of eye contact with Prosecutor, eye contact with defendant or defense attorney.

5. <u>Body Language</u> - arms folded, leaning away from questioner, obvious boredom may show anti-prosecution tendencies.

6. <u>Rehabilitated Jurors</u>, or those who vacillated in answering D.A.'s questions.

7. <u>Juror Responses</u> which are inappropriate, non-responsive, evasive or monosyllabic may indicate defense inclination.

8. <u>Communication Difficulties</u>, whether because English is a second language, or because juror appeared to have difficulty understanding questions and the process.

9. <u>Unrevealed Criminal History</u> re:  voir dire on "previous criminal justice system experience."

10. Any other sign of defiance, sympathy with the defendant, or antagonism to the State.

The state trial court determined that prosecutors used this cheat sheet during *Batson* hearings to quickly produce ostensibly race-neutral explanations for strikes that were, in truth, motivated by race.  App. 82-86.[7]

---

[7] Justice Marshall foresaw this very problem at the time *Batson* was decided:

> [W]hen a defendant can establish a prima facie case, trial courts face the difficult burden of assessing prosecutors' motives.  Any prosecutor can easily assert facially neutral reasons for striking a juror, and trial courts are ill equipped to second-guess those reasons.  How is the court to treat a prosecutor's statement that he struck a juror because the juror had a son about the same age as

The state trial court further confirmed its finding that prosecutors extensively relied on race in capital jury selection by reviewing cases where prosecutors disproportionately seated African-American jurors in order to gain a tactical advantage. The state trial court found that in capital cases involving the racially-motivated murder of two black citizens by white supremacists, Cumberland County prosecutors reversed their usual use of race. Instead of disproportionately striking black jurors, prosecutors instead sought a tactical advantage by disproportionately selecting black jurors. App. 63-68. In one case, prosecutors used nine of ten peremptory strikes against non-black venire members. In the other, they used ten of ten strikes against non-black venire members. App. 65. Furthermore, in one of the cases, the prosecution's notes "segregated African-American potential jurors by race and created a list of all black jurors accompanied by brief descriptions." App. 65-66. Golphin's and Robinson's trial prosecutors participated in this racially-tainted jury selection. App. 63-64. As explained by

---

> defendant, or seemed "uncommunicative," or "never cracked a smile" and, therefore "did not possess the sensitivities necessary to realistically look at the issues and decide the facts in this case"? If such easily generated explanations are sufficient to discharge the prosecutor's obligation to justify his strikes on nonracial grounds, then the protection erected by the Court today may be illusory.

*Batson v. Kentucky*, 476 U.S. 79, 105-06 (1986) (Marshall, J., concurring) (citations omitted).

the state trial court, the prosecutors' "participation in this process, in cases where the State perceived it had something to gain by seating African-Americans on the jury, is strong evidence that [they] took race into account in [their] jury selection practices in a very considered fashion." App. 95-96.

The state trial court in Golphin's case also found that his prosecutor, with race consciously in his mind, disparately questioned a black juror about how he felt "as a young black male," while not asking a single white juror how they felt as a "white person" and singled out this same black juror for questions about Bob and Ziggy Marley and Emperor Selassie of Ethiopia. App. 68-74.[8]

The state trial court determined that Golphin was ineligible for the death penalty and entitled to have the sentence of death vacated. App. 219. On the same day, the court entered a separate certified state court judgment vacating the death sentence and re-sentencing Golphin to life imprisonment without parole. App.

---

[8] Many of the foregoing facts bear striking resemblance to the U.S. Supreme Court's recent opinion in *Foster v. Chatman*, 136 S.Ct. 1737 (2016). In *Foster*, the Court found that prosecutors intentionally exercised peremptory strikes against African-American venire members based on race, in violation of *Batson*, based in part on evidence that the prosecutors wrote notes during jury selection singling out African-American jurors, focusing on their race, and referring to African-Americans in negative terms, such as a note that stated, "NO. No Black Church." *See also id.* at 1755 ("The sheer number of references to race in [the prosecution] file is arresting.").

220-22.  Following the entry of the state trial court's order granting relief, Golphin was removed from death row and began serving his life imprisonment sentence.[9]

The State, with no right to appeal the life sentences of Robinson and Golphin imposed by the trial court, nonetheless petitioned the North Carolina Supreme Court to exercise its extraordinary powers to suspend the rules of appellate procedure, and grant review of the orders granting relief in Petitioners' cases.  Petitioners opposed certiorari but the state supreme court allowed review. In their merits briefs, Petitioners raised the claim that any further proceedings beyond the trial court were barred by the Double Jeopardy Clause.  App. 426-29, 493-96.

During the pendency of the State's appeal, the General Assembly repealed the RJA, effective June 19, 2013.  *See* S.L. 2013-154.[10]  The repeal bill stated that it applied to all pending RJA motions filed prior to the effective date of the repeal, and that all such motions were void.  The repeal bill went even further by also purporting to apply to litigants such as Robinson and Golphin, who obtained relief under the RJA prior to repeal, but whose relief could potentially be vacated upon appeal:

---

[9] The history of Golphin's sentence status may be found online at www.ncdps.gov by following these hyperlinks: About/Prisons/Death Penalty/Offenders on Death Row.

[10] The RJA repeal is attached to the brief as an addendum.

> This section does not apply to a court order resentencing a petitioner to life imprisonment without parole pursuant to the provisions of Article 101 of Chapter 15A of the General Statutes prior to the effective date of this act if the order is affirmed upon appellate review and becomes a final Order issued by a court of competent jurisdiction. This section is applicable in any case where a court resentenced a petitioner to life imprisonment without parole pursuant to the provisions of Article 101 of Chapter 15A of the General Statutes prior to the effective date of this act, and the Order is vacated upon appellate review by a court of competent jurisdiction.

The Cumberland County defendants who were granted relief under the RJA - Robinson, Golphin, Walters, and Augustine - are the only four litigants in the state of North Carolina to have proceeded to an RJA trial, and thus are the only four persons in the state to whom this provision applies. The legislature appears to have expressly directed this repeal provision at Petitioners.

After briefing and oral argument, on December 18, 2015, the state supreme court issued orders vacating the trial court's RJA orders in Robinson's and Golphin's cases, and remanding the matters to the senior resident superior court judge of Cumberland County for reconsideration. The state supreme court did not explicitly address Petitioners' double jeopardy argument, but it did hold that only the constitutional issues that the State had raised could be considered on remand. The court held that the trial court erred in denying the State's motion for a third continuance in Robinson's case, and further erred in joining the cases of Golphin, Walters, and Augustine for hearing. Finally, the state supreme court did not

16

reinstate the judgments of death, but instead remanded the cases to the trial court for further hearings, and instructed that, in the interest of justice, further proceedings may include consideration of additional statistical studies and appointment of an expert under N.C. R. Evid. 706.  App. 432-33, 509-12.

The state supreme court's mandates in Robinson's and Golphin's cases issued to the trial court on January 7, 2016.  *See* N.C. R. App. P. 32(b).  After the court's mandates issued, the Department of Public Safety transferred Petitioners from the medium security facilities where they were serving their life imprisonment sentences back to death row in Central Prison.

Having exhausted their double jeopardy arguments in the state supreme court, on February 4, 2016, Petitioners filed separate petitions for writs of habeas corpus in the United States District Court for the Eastern District of North Carolina, requesting that the court issue the writ because they are unlawfully confined on death row in violation of the Double Jeopardy Clause, and seeking relief from any further state court proceedings and an unconstitutional attempt by the State to reinstate their death sentences in the state trial court.  Petitioners also moved the district courts for stays or preliminary injunctions against any further proceedings in state court.  App. 553-74, 607-28.[11]

---

[11] In addition, on May 13, 2016, Petitioners and the two other RJA defendants, Walters and Augustine, filed a petition for writ of certiorari in the United States Supreme Court seeking review of the question whether the state supreme court

On June 4, 2016, the district court, the Honorable James C. Dever III presiding, denied Robinson a stay or injunction, granted the Warden's motion to dismiss Robinson's petition for non-exhaustion, and dismissed the petition without prejudice. Judge Dever found that *Younger v. Harris*, 401 U.S. 37 (1971), counseled abstention, and that Robinson failed to exhaust his double jeopardy arguments in state court. App. 644-55. On June 7, 2016, the district court, the Honorable Terrence W. Boyle presiding, dismissed Golphin's petition without prejudice, also on the bases of *Younger* and non-exhaustion. App. 590-602.

On June 7, 2016, Petitioners entered separate notices of appeal to this Court and filed separate emergency motions to stay or enjoin the state court hearing scheduled for June 9, 2016. App. 604, 657; Docket Entry 4-1 in case nos. 16-11 and 16-12.

On June 8, 2016, by a divided 2-1 vote in each of Petitioners' cases, the Court summarily denied the motions for stay or injunction, with Judges King and Shedd voting to deny the motions, and Judge Floyd voting to grant the motions. Petitioners sought en banc review on the afternoon of June 8. On the morning of June 9, 2016, the Court denied Petitioners' motions for rehearing en banc. *See*

---

erred under the Double Jeopardy Clause by remanding their cases for further proceedings after the state court acquitted them of the death penalty under the RJA. *See Robinson, Augustine, Golphin, and Walters v. State of North Carolina*, No. 15-1397 (docketed on May 17, 2016). The petition is pending and the State's response is due August 17, 2016.

Docket Entries 8, 9, and 12 in case nos. 16-11 and 16-12. Petitioners' RJA cases remain pending in state superior court in Cumberland County.

On June 13, 2016, this Court issued a preliminary briefing order and consolidated Petitioners' cases for hearing before the Court. Docket Entries 13 and 14 in consolidated case no. 16-11(L).

## SUMMARY OF ARGUMENT

After juries sentenced them to death, Petitioners filed motions under the newly enacted RJA, claiming that they were legally exempt from the death penalty because their death sentences were sought or obtained on the basis of race. Following an adversarial proceeding, the trial court, designated by state law to be the trier of fact, found that Petitioners had proven their claims of racial bias, and sentenced them to life imprisonment as it was required to do under the RJA. The State appealed to the North Carolina Supreme Court, and in response Petitioners argued that their life sentences were final judgments and that further proceedings would violate their rights under the Double Jeopardy Clause. The State replied to the merits of Petitioners' double jeopardy argument and raised no procedural bar. Implicitly rejecting the argument, the state supreme court held that the state trial court had erroneously denied the state a continuance of the RJA trial and erroneously joined three cases for hearing, and remanded for further proceedings on Petitioners' claims.

19

Given that Petitioners presented their double jeopardy claim to the state supreme court, and that no state procedural bar applied to the claim, the state high court's remand for further proceedings renders the double jeopardy claim exhausted. The remand also places Petitioners at risk of suffering the irreparable harm attendant to a second RJA trial following their initial acquittal of death-eligibility in state court. The federal district courts below thus erred in dismissing the habeas petitions on the bases of non-exhaustion and *Younger* abstention.

Moreover, in light of the fact that the state law's designated trier of fact conducted an adversarial trial and concluded that Petitioners are ineligible for the death penalty under the RJA, the Double Jeopardy Clause prohibits the future imposition of that penalty on Petitioners. *See Bullington v. Missouri*, 451 U.S. 430 (1981) (applying the Double Jeopardy Clause to the sentencing phase of a capital trial because that proceeding has "the hallmarks of the trial on guilt or innocence.").

## **ARGUMENT**

### I. **Petitioners' double jeopardy claim was exhausted when it was presented to and adversely decided by the state supreme court.**

The district courts' determination that exhaustion doctrine bars federal review ignores the fact that Petitioners' double jeopardy claim has been finally

20

decided in the state supreme court and is not subject to any further state review. The claim is thus exhausted and ripe for federal review.[12]

Petitioners directly raised the double jeopardy issue in the state supreme court. Following imposition of life sentences by the state trial court, Petitioner Robinson raised the claim in his brief to the state supreme court after certiorari was granted. App. 493-96. Likewise, Petitioner Golphin raised the claim in his brief, as well as in his initial response in opposition to the State's petition for certiorari review. App. 408-11, 426-29.[13]

Significantly, the State did not argue in its reply to Golphin's opposition to certiorari, or in reply to Golphin and Robinson's briefs on the merits, that the double jeopardy claim was improperly raised or procedurally defaulted. Instead, the State addressed the double jeopardy claim on its merits. App. 413-14, 461-62,

---

[12] The standard for reviewing a district court's denial of a habeas petition on exhaustion grounds is de novo. *Jones v. Sussex I State Prison*, 591 F.3d 707, 712 (4th 2010).

[13] North Carolina law permits the adjudication of the double jeopardy claim as a threshold matter on appeal, even when it has not been first raised in the trial court. N.C. Gen. Stat. § 15A-1445(a) provides, "[u]nless the rule against double jeopardy prohibits further prosecution, the State may appeal from the superior court to the appellate division [under certain enumerated circumstances]." Moreover, prior to the state trial court's imposition of life sentences and the State's decision to appeal, the double jeopardy claim was not ripe and thus could not have been raised in the trial court. *See, e.g., Barrett v. Acevedo*, 143 F.3d 449, 462 (8th Cir. 1998), *rev'd on other grounds*, 169 F.3d 1155 (8th Cir.) (en banc), *cert. denied*, 528 U.S. 846 (1999) ("[B]y raising the constitutional violation in his petition for rehearing to the Supreme Court of Iowa, [petitioner] fairly presented his claim. Obviously this was his first opportunity to raise the issue in state court because the alleged constitutional error did not occur until the Supreme Court of Iowa ruled.").

505-06. The State's merits reply confirms that the double jeopardy claim was exhausted in the state high court. *See Jones v. Sussex I State Prison*, 591 F.3d 707, 714 (4th Cir. 2010) ("[T]he Commonwealth itself recognized and addressed the double jeopardy issue in its opposing brief before the state Supreme Court, evidencing Jones's fair presentment of that claim.") (citing *Smith v. Digmon,* 434 U.S. 332, 333 (1978) (per curiam) (finding that state's opposition in its brief to petitioner's constitutional claim in state court supported conclusion that petitioner had fairly presented that claim)).

After considering the parties' briefing on double jeopardy, the state supreme court silently rejected the double jeopardy claim by remanding the cases to the trial court for resentencing proceedings pursuant to the RJA. *See* App. 432-33, 511 (state supreme court ordering in both Petitioners' cases, "[i]n any new hearing on the merits, the trial court may" consider additional statistical studies or appoint an expert under N.C. R. Evid. 706). Had the state supreme court not rejected the double jeopardy claim presented in Petitioners' briefs, it could not have proceeded to consider other issues on appeal or remanded for resentencing. *See United States v. Mackins*, 32 F.3d 134, 137-38 (4th Cir. 1994) (recognizing that a judgment of "acquittal under the Double Jeopardy Clause . . . bars a government appeal and a retrial.") (citations omitted).

Under circumstances such as these, the U.S. Supreme Court has held that there is a presumption that the state court adjudicated the claim on the merits. In *Harrington v. Richter*, 562 U.S. 86 (2011), a capital defendant sought post-conviction review in state court, and the state court denied the petition in a one-sentence summary order that had no accompanying statement of reasons. *Id.* at 92, 96. The Supreme Court explained that the state court's summary treatment of the petition was nonetheless an adjudication on the merits because "[t]he state court did not say it was denying the claim for any other reason." *Id.* at 99. The Court went on to hold that a state court's unexplained denial of a claim is *presumed* an adjudication on the merits absent any indication to the contrary:

> When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary. The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely.

*Id.* at 99-100 (citations omitted).

In *Harrington*, the Court rejected any notion that the presumption could be overcome by "the theoretical possibility that the members of the [state court] may not have agreed on the reasons for denying" the claim, calling such an argument "pure speculation." *Id.* at 100. As such, in this case, there is no indication that the

state supreme court's implicit denial of Petitioners' double jeopardy argument was anything other than a denial on the merits.

Therefore, the double jeopardy claim has been exhausted and is ripe for federal review. "So far as protecting that interest [against multiple prosecutions] is concerned, the relevant state remedies are exhausted when, as in this case, the petitioner has nowhere else to turn in the state judicial system to get the charges against him dismissed before trial." *U. S. ex rel. Stevens v. Circuit Court of Milwaukee Cty., Wis., Branch VIII*, 675 F.2d 946, 947 (7th Cir. 1982). Petitioners have "given the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Elmore v. Foltz*, 768 F.2d 773, 776 (6th Cir. 1985) (citation omitted) ("Once an issue has been presented to the state's highest court, exhaustion does not require future repetitive presentation to such court by additional attempts through a variety of successive petitions"); *Shute v. Texas*, 117 F.3d 233, 237 (5th Cir. 1997) ("When a state prisoner properly presents his federal claim to the highest state court on direct review, he need not ask for state collateral relief on the same ground and on the same evidence.").[14]

---

[14] Petitioners acknowledge that they have re-raised the double jeopardy claim in pleadings submitted to the state trial court on remand. App. 224, 402. However, Petitioners re-raised the claim on remand simply to preserve it in the event of an

The district courts reached the opposite conclusion regarding exhaustion. However, they did so on bases that were either unsupported by the facts or by law. The district court in Golphin's case found the double jeopardy claim unexhausted on the factually incorrect basis that Golphin did not raise the claim in response to the state's petition for writ of certiorari. App. 601. Golphin's response brief in opposition to certiorari plainly contained the double jeopardy argument. App. 408-11. In Robinson's case, the district court correctly noted that Robinson did not raise double jeopardy in opposition to certiorari, and the court found the claim unexhausted on this basis. App. 654. However, under North Carolina law, there is no appellate rule of procedure or case law requiring a party to raise arguments in certiorari oppositions as a precursor to raising them in the merits brief in the event certiorari is granted. *See generally* N.C. R. App. P. 21. Neither the Warden nor the district court identified any authority for the proposition that failure to assert arguments in opposition to a certiorari petition precludes raising those arguments in merits briefing. Accordingly, the district courts erred, and this Court should find the double jeopardy claim exhausted.

---

adverse procedural ruling by this Court. Petitioners' preservation of their claim in state court does not change their position that the claim was exhausted in the state supreme court and is not subject to further state litigation. *See generally Smith v. Kemp*, 715 F.2d 1459, 1476 (11th Cir. 1983) (Hatchett, J., concurring in part and dissenting in part) (acknowledging importance of issue preservation in capital cases; noting that mastermind of the murder received a life sentence as a result of a preserved constitutional error, while the co-defendant whose attorneys did not preserve the issue faced execution).

## II. *Younger* abstention is not appropriate because, in the absence of federal review, there is a substantial likelihood Petitioners will suffer an irreparable double jeopardy violation.

In addition to exhaustion, the district courts dismissed the petitions on the basis of *Younger* abstention, finding that Petitioners "failed to make the requisite showing [regarding *Younger*]. The merits of [Petitioners' double jeopardy] claims are far from clear, and any harm [they] may suffer by proceeding in state court is neither immediate nor irreparable." App. 597, 650. However, the district courts erred because the well-established double jeopardy exception to *Younger* applies in this case.[15]

Although *Younger* embodies a strong federal policy against intervention in state proceedings, this Court and the other courts of appeals "have unanimously recognized that a colorable claim that a second trial will violate a defendant's double jeopardy right is a preeminent example of one of the very few extraordinary circumstances justifying federal court intervention in a pending state criminal proceeding." *Gilliam v. Foster*, 75 F.3d 881, 904 (4th Cir. 1996) (citations omitted) (affirming grant of writ of habeas corpus, which prevented the state court from retrying the defendants after their first state trial ended in mistrial). The courts have fashioned this exception to *Younger* because "a portion of the

---

[15] "[T]he district court's decision to abstain under *Younger* [is reviewed] for abuse of discretion," and "an error of law constitutes an abuse of discretion." *Nivens v. Gilchrist*, 319 F.3d 151, 153 (4th Cir. 2003) (*Nivens I*).

constitutional protection [the Double Jeopardy Clause] affords would be irreparably lost if Petitioners were forced to endure the second trial before seeking to vindicate their constitutional rights at the federal level." *Gilliam*, 75 F.3d at 904.

In *Abney v. United States*, 431 U.S. 651, 661-62 (1977) (internal citations omitted), the Supreme Court described at length the harm involved in a second trial that violates the Double Jeopardy Clause, and explained that adjudication of the claim prior to the second trial is necessary to ensure the availability of a remedy:

> Because of this focus on the "risk" of conviction, the guarantee against double jeopardy assures an individual that, among other things, he will not be forced, with certain exceptions, to endure the personal strain, public embarrassment, and expense of a criminal trial more than once for the same offense. It thus protects interests wholly unrelated to the propriety of any subsequent conviction. Mr. Justice Black aptly described the purpose of the Clause:
>
> "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."
>
> Obviously, these aspects of the guarantee's protections would be lost if the accused were forced to "run the gauntlet" a second time before an appeal could be taken; even if the accused is acquitted, or, if convicted, has his

27

conviction ultimately reversed on double jeopardy grounds, he has still been forced to endure a trial that the Double Jeopardy Clause was designed to prohibit. Consequently, if a criminal defendant is to avoid exposure to double jeopardy and thereby enjoy the full protection of the Clause, his double jeopardy challenge to the indictment must be reviewable before that subsequent exposure occurs.

Petitioners' cases involve the precise constitutional concerns articulated in *Gilliam* and *Abney*. Following passage of the RJA, both Petitioners underwent extensive state trials on the question whether they were eligible for the death penalty under the RJA criteria. The state trial court found they were not so eligible. *See* App. 10, 231. On appeal, Petitioners argued to the state supreme court that any further proceedings that could lead to an RJA re-trial were barred by the Double Jeopardy Clause. App. 408-11, 426-29, 493-96. Those arguments were rejected by the state high court and cannot be the subject of any further state review. *See* App. 432, 509. Thus, in the absence of intervention by this Court, Petitioners will be forced to endure the personal strain, and continuing anxiety and insecurity, attendant to yet another RJA trial at which they may be resentenced to death. A successive RJA trial would also enhance the possibility that Petitioners will be improperly resentenced to death even though they are not so eligible under

the RJA. These are very the harms the Double Jeopardy Clause was designed to prevent.[16]

It is also significant that neither Petitioner presently has any valid judgment of sentence. At the initial RJA trial, the state trial court vacated the death sentences and imposed judgments of life imprisonment. App. 220-22, 398-400. On appeal, the state supreme court vacated the trial court's *orders* finding Petitioners ineligible for the death penalty, but said nothing of its *judgments* imposing life imprisonment. *See* App. 432, 510-11 (ordering in both Petitioners' cases that "the trial court's order is vacated"). Nor did the state supreme court remand for imposition of new death sentences. Further, to date, the state trial court has not imposed (or reimposed) any new death sentences, and it is only the trial court that has authority to do so. *See* N.C. Gen. Stat. § 15A-1417(c) ("If a [post-conviction] motion is granted in the appellate division and resentencing is required, the case must be remanded to the trial division for entry of a new sentence."); *State v. Whitehead*, 365 N.C. 444, 449 (2012) (recognizing that, in order to reimpose the sentence that was in place prior to the trial court's grant of post-conviction relief, it

---

[16] *See also Glossip v. Gross*, 135 S.Ct. 2726, 2765 (2015) (Breyer, J., dissenting) (recognizing "[t]he dehumanizing effect of . . . uncertainty as to whether a death sentence will in fact be carried out."); *People v. Anderson,* 6 Cal.3d 628, 649 (1972) ("[C]ruelty of capital punishment lies not only in the execution itself and the pain incident thereto, but also in the dehumanizing effects of the lengthy imprisonment prior to execution during which the judicial and administrative procedures essential to due process of law are carried out.").

was necessary to remand "for reinstatement of the original . . . judgment."); *State v. Wilkerson*, 232 N.C. App. 482, 496 (2014) (same).  Because Petitioners are not presently under any valid judgment of sentence, irreparable harm will inure if the state trial court is permitted to proceed to a second RJA trial where death sentences may be imposed.  *See Gilliam*, 75 F.3d at 904 (holding that "irreparable deprivation of this Fifth Amendment Double Jeopardy right is an extraordinary circumstance warranting federal court equitable intervention in Petitioners' state criminal proceeding.").

The district courts below resisted this conclusion by relying on this Court's discussion of *Younger* and double jeopardy claims in *Nivens v. Gilchrist*, 319 F.3d 151 (4th Cir. 2003) (*Nivens I*).  App. 595-97, 649-50.  However, a careful comparison of *Nivens I* with this case only underscores the conclusion that *Younger* abstention is unwarranted.

In *Nivens I*, the defendants were arrested under state law for selling drugs, and were assessed taxes for possession of those drugs.  After the defendants paid the taxes in full, the State of North Carolina indicted them on criminal drug charges.  Then, without first seeking relief in state court, the defendants filed suit in federal court under 42 U.S.C. § 1983, arguing that any punishment imposed in their criminal trial would be an improper second punishment in violation of the Double Jeopardy Clause.  319 F.3d at 152-53.

At the outset, the argument against abstention in this case is far more compelling than in *Nivens I* because this case involves multiple *prosecutions* in violation of double jeopardy. *Nivens I* only involved multiple *punishments*. In multiple prosecution cases, there is much more ballast weighing against abstention because, as noted in *Abney*, no remedy is possible once the second trial is held. In contrast, multiple punishments violations can always be remedied on appeal after the state trial is held. *See U. S. ex rel. Stevens v. Circuit Court of Milwaukee Cty., Wis., Branch VIII*, 675 F.2d 946, 948-49 (7th Cir. 1982) ("The policy of avoiding multiple trials . . . is the only objective of the double jeopardy clause that cannot be adequately protected by appeal . . . . Where as in the present case the defendant is not being asked to stand trial a second time - where the first proceeding was . . . a guilty-plea . . . the balance inclines in favor of the state's interest in being allowed to conduct its criminal proceedings without interruption by federal judges.") (internal quotations and citation omitted); *Murphy v. Com. of Va.*, 896 F. Supp. 577, 582 (E.D. Va. 1995) ("The soundness of drawing a distinction between multiple punishments and multiple prosecutions in this context is apparent: If an accused is facing multiple convictions (and, therefore, multiple punishments) in violation of the Double Jeopardy Clause, he may appeal those convictions to obtain full relief. If, by contrast, he faces multiple *prosecutions,* neither the second (or third, or fourth) trial itself nor an appeal therefrom can provide him with a remedy;

the *trial itself* is the constitutional wrong, above and beyond any possible punishment.") (emphasis in original).[17]

Next, the Court in *Nivens I* concluded abstention was justified in part because the defendants there "yet ha[d] access to pretrial avenues in their current criminal prosecutions whereby they may raise their constitutional contentions before any double jeopardy injury could inure . . . . Appellants have state procedures whereby they may foreclose a violation of their double jeopardy rights, [thus] any double jeopardy harm at this stage of Appellants' litigation is neither immediate nor irreparable." 319 F.3d at 159.

Petitioners here do not have any state pretrial avenues for their double jeopardy claim. They have already taken their claim as far as it can go in the state courts. They presented it to the state supreme court in their principal briefing, and it was rejected. Petitioner's double jeopardy claim thus has no further avenue in the North Carolina state courts, and a second RJA trial is forthcoming absent

---

[17] This Court's decision in *Nivens v. Gilchrist*, 444 F.3d 237 (4th Cir. 2006) (*Nivens II*), confirms the significant distinction between multiple prosecution and multiple punishment cases. In *Nivens II*, following the Court's initial ruling in *Nivens I*, the petitioners returned to state court and exhausted their double jeopardy claim. Upon return to federal court, the district court again applied *Younger* abstention. *Nivens II*, 444 F.3d at 240. Affirming this ruling, the Court observed that the petitioners were free to vindicate their rights by appealing their double jeopardy claim to the state and U.S. supreme courts, and by seeking post-conviction review. *Id.* at 248. In contrast, in this case, if Petitioners proceed to a second RJA trial, any chance they may have of obtaining a remedy will be lost. *See also id.* at 242-43 ("Unlike the petitioners in *Gilliam III*, the Appellants in *Nivens I* had yet to undergo an initial trial . . . .").

federal intervention. Given this, the preference for comity expressed in *Younger* is substantially outweighed by the need for federal review. *See Nivens I*, 319 F.3d at 159 (explaining *Younger* abstention was not warranted in *Gilliam* because, if relief were denied, the litigants would have been "forced to endure *the second trial* before seeking to vindicate their constitutional rights at the federal level.") (quoting *Gilliam*; emphasis added in *Nivens I*).[18]

Finally, the Court in *Nivens I* and *Nivens II*, and the district courts here, abstained on the additional basis that a preliminary assessment, while not determinative of the merits, showed the double jeopardy claim to be "far from clear." *Nivens I*, 319 F.3d at 162; *Nivens II*, 444 F.3d at 244; App. 597, 650. The Court should accord the district courts' findings minimal weight. Unlike *Nivens*, the district courts accompanied their conclusions with no analysis whatsoever. Moreover, the *Younger* inquiry is essentially a weighing of constitutional and policy factors, and the factors discussed above – harm from a second RJA trial that would go unremedied without federal review, and exhaustion of the claim in state court – far outweigh any superficial preliminary analysis of Petitioners' claim. In

---

[18] In *Nivens II*, the Court noted that *Nivens I* had specifically reserved the question whether the district court should exercise jurisdiction once state pre-trial procedures were exhausted. 444 F.3d at 243. *Nivens II* later held that abstention was still warranted even after the petitioners exhausted their claim because they had not also shown a great or substantial likelihood of any constitutional deprivation. *Id.* at 243-44. Thus, after *Nivens II*, exhaustion remains relevant to, although not necessarily determinative of, the *Younger* inquiry.

any event, because Petitioners are entitled to relief as shown below, *Younger* does not apply and the Court should not limit itself to a preliminary assessment of the merits. *See Nivens II*, 444 F.3d at 242 ("*Gilliam III* held that a party must show a substantial likelihood of an irreparable double jeopardy violation in order to avoid *Younger* abstention.") (internal quotations and citation omitted).

**III.    Given that the designated trier of fact concluded that Petitioners were ineligible for the death penalty following a trial-like sentencing proceeding, the state supreme court erred under the Double Jeopardy Clause by remanding for resentencing proceedings that again could expose Petitioners to the death penalty.**

Turning to the merits, Petitioners contend that the Double Jeopardy Clause bars further sentence-determination proceedings after the state trial court previously conducted an adversarial RJA trial and concluded that Petitioners are ineligible for the death penalty under state law.[19]

---

[19] Petitioners have not been resentenced to death but instead currently await resentencing proceedings. Consequently, they are not in custody pursuant to a judgment or sentence of a state court. Accordingly, § 2241 is the proper vehicle in which to review this issue, and this Court's review is de novo. *See Walck v. Edmondson*, 472 F.3d 1227, 1235 (10th Cir. 2007) ("hold[ing] that § 2241 is the proper avenue by which to challenge pretrial detention, including when such challenges are based on double jeopardy grounds" and explaining § 2254 does not apply to pretrial double jeopardy challenges because such a claim "is neither challenging a state conviction nor sentence and, as a result, § 2254 is inapplicable."); *In re Wright*, ___ F.3d ___, 2016 WL 3409851 (4th Cir. June 21, 2016) (holding that § 2254 does not apply to persons not "in custody pursuant to the judgment of a State court."); *Harrison v. Gillespie*, 640 F.3d 888, 896 (9th Cir. 2011) ("In effect, Harrison is currently in custody under an indeterminate sentence for his first-degree murder conviction, and he is attacking the possibility of

The constitutional prohibition against double jeopardy has long been recognized to bar subsequent proceedings after acquittal. *Benton v. Maryland,* 395 U.S. 784, 795 (1969) (tracing the origins of double jeopardy protections to the Greek and Roman times, and its application in capital cases). This protection was extended to capital sentencing decisions by *Bullington v. Missouri,* 451 U.S. 430, 446 (1981).

Before *Bullington*, the Supreme Court had treated capital sentencing decisions like all other sentencing issues: an ancillary outcome of the trial that was not entitled to double jeopardy protections. *Stroud v. United States*, 251 U.S. 15 (1915) (double jeopardy does not prevent the state from seeking death after a successful appeal of life verdict in murder case); *North Carolina v. Pearce*, 395 U.S. 711 (1969) (double jeopardy does not prohibit the imposition of a harsher sentence for the same offense after retrial if the defendant successfully appeals the conviction). The Supreme Court changed course in *Bullington* because of the enormous changes wrought after *Furman v. Georgia*, 408 U.S. 238 (1972), with bifurcated trials and separate sentencing proceedings. In contrast to the unfettered discretion in sentencing from *Stroud* and *Pearce*, exercised with no separate sentencing proceedings, the defendant in *Bullington* faced a full sentencing proceeding with the "hallmarks of the trial on guilt or innocence." *Bullington,* 451

---

receiving a death sentence in the future. We therefore have jurisdiction under 28 U.S.C. § 2241.").

U.S. at 439.  "It was itself a trial on the issue of punishment so precisely defined by the [state] statutes."  *Id.* at 438.  After a separate sentencing proceeding with guided discretion, the jury's imposition of life imprisonment means the "jury has already acquitted the defendant of whatever was necessary to impose the death sentence." *Id*. at 445 (quotation and citation omitted).

The Supreme Court further extended this protection to life imprisonment verdicts imposed by trial judges after sentencing hearings in *Arizona v. Rumsey*, 467 U.S. 203 (1984).  The trial court in *Rumsey* initially imposed a life sentence after finding insufficient evidence to support an aggravating factor, but the state supreme court reversed after concluding the trial court made a legal error in its analysis; the trial court imposed death on remand.  *Id*. at 206, 208.  The Supreme Court reinstated the life imprisonment verdict, holding that double jeopardy barred re-sentencing after imposition of a life verdict by the trial judge after a trial-like determination, no matter what the alleged error.  *Id*. at 209-210.[20]  The Supreme Court recognized two factors that meant the Arizona judicial-sentencing scheme qualified for double jeopardy protections: the fact that the trial judge, like the jury, had to distinguish between the two verdicts of death and life without parole; and that the sentencing decision was guided by statutory standards.  *Id.*

---

[20] This aspect of the Supreme Court's ruling is salient to Petitioners' cases.  Even assuming *arguendo* that the state supreme court had authority to hear Petitioners' cases and correctly concluded that the trial court erred, Petitioners' RJA retrials still cannot go forward in light of *Rumsey*.

The Supreme Court emphasized the importance of fact finding for the double jeopardy analysis in *Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003). There, the jury had deadlocked on the question of punishment, and the trial court had imposed a life sentence pursuant to state law. *Id*. at 105. The defendant successfully appealed his conviction; the state once again sought the death penalty on retrial, and a death sentence was imposed. *Id*. The Supreme Court upheld this death sentence after concluding that the jury had not made "findings sufficient to establish legal entitlement to the life sentence." *Id*. at 108. "[A]n 'acquittal' at a trial-like sentencing phase, rather than the mere imposition of a life sentence, is required to give rise to double-jeopardy protections." *Id*. at 107.

The imposition of a life sentence in Petitioners' cases is clearly protected by this case law. In 2009, the state legislature redefined the statutory eligibility for the death penalty in North Carolina when it enacted the Racial Justice Act. *See* N.C. Gen. Stat. § 15A-2011. The RJA created an affirmative defense to death sentences, plainly stating that "no person shall be subject to or given a sentence of death or shall be executed pursuant to any judgment that was sought or obtained on the basis of race." N.C. Gen. Stat. § 15A-2010. The Supreme Court has long recognized that a verdict based on a defense is entitled to the full protection of double jeopardy. *See Burks v. United States,* 437 U.S. 1 (1978) (double jeopardy

barred retrial of defendant after defendant raised insanity defense, lost with the jury, but appellate court concluded there was insufficient evidence to prove sanity).

The RJA applied both prospectively to all trial cases and retroactively, to defendants previously sentenced to death. N.C. Gen. Stat. § 15A-2012(a). For both classes, the RJA requires separate evidentiary proceedings by trial courts to determine if the death sentence was impermissibly tainted by racial bias. N.C. Gen. Stat § 15A-2012(a). Like the Supreme Court double jeopardy cases finding in favor of the defendants, the RJA trial requires fact finding confined by statutorily-guided standards. *See Bullington*, 451 U.S. at 439; *Rumsey*, 467 U.S. at 209-210; N.C. Gen. Stat. § 15A-2011 (setting forth standards and evidence to be considered by the trial court in making its findings). The RJA statutory scheme sets forth the "findings sufficient to establish legal entitlement to the life sentence." *Sattazahn,* 537 U.S. at 108; N.C. Gen. Stat. § 15A-2012 ("If the court finds that race was a significant factor . . . the court shall order . . . that the death sentence imposed by the judgment shall be vacated and the defendant resentenced to life imprisonment without the possibility of parole").

Like the Supreme Court cases, the RJA permits only two possible outcomes: life without parole or death. *Bullington*, 451 U.S. at 439; *Rumsey*, 467 U.S. at 209-210; N.C. Gen. Stat. § 15A-2012(a)(3). These two clearly delineated options in RJA trials are in sharp contrast to the standard relief available in post-conviction

cases, which includes a new trial, dismissal of the charges, and other appropriate relief.  N.C. Gen. Stat. § 15A-1417.  In short, whether defendants proceed in trial cases or in post-conviction, the RJA established new trial-like proceedings where courts must hear evidence, apply the evidence to statutory guidelines, and make findings sufficient to establish or refute legal entitlement to a life sentence.  A life sentence produced by this process is protected by the Double Jeopardy Clause from future proceedings.  *Sattazahn,* 537 U.S. at 108; *Bullington*, 451 U.S. at 439; *Rumsey*, 467 U.S. at 209-210.

The RJA trials conducted in state court constitute "trial-like" proceedings, and involve constitutionally protected fact finding by the trial court.  In each of Petitioners' cases, the state trial court heard two weeks of evidence in an adversarial setting subjected to cross-examination and argument.  The proceedings included the testimony of numerous expert witnesses and the introduction of over 170 exhibits.  To answer the factual question whether "race was a significant factor" in the exercise of peremptory strikes by the prosecution in the State of North Carolina and Cumberland County at the time of Petitioners' capital trials, the state trial court issued lengthy orders with hundreds of findings of fact.  Applying the evidence to the statutory guidelines, the state trial court concluded that race was a significant factor at the time of Petitioners' trials and that they were entitled

to life imprisonment verdicts. Pursuant to the statute, the state trial court resentenced Petitioners to life imprisonment without parole.

Finally, *Evans v. Michigan*, 133 S.Ct. 1069, 1078 (2013), provides additional support for the conclusion that the trial court's findings at the RJA trials are protected by the Double Jeopardy Clause. In *Evans*, the Court explained that whether a trial court's action is accorded double jeopardy protection "turns not on the form of the trial court's action, but rather whether the action 'serve[s]' substantive 'purposes' or procedural ones." *Id.* at 2078, quoting *United States v. Scott*, 437 U.S. 82, 98, n.11 (1978).

There is no doubt that the RJA proceedings at issue here were substantive, not procedural. The RJA required the trial court to determine whether the petitioners were eligible for execution under state law. The RJA embodies a substantive guarantee that exempts from execution the class of defendants whose capital trials and prosecutions were tainted by racial bias. Because of the racial taint at Petitioners' trials, the state trial court made a substantive finding that Petitioners were legally entitled to life sentences under state law, and that finding is protected by the Double Jeopardy Clause. *See, e.g.*, *Arizona v. Rumsey*, 467 U.S. 203, 211 (1984) ("The trial court entered findings denying the existence of each of the seven statutory aggravating circumstances, and as required by state law, the court then entered judgment in respondent's favor on the issue of death.

40

That judgment, based on findings sufficient to establish legal entitlement to the life sentence, amounts to an acquittal on the merits and, as such, bars any retrial of the appropriateness of the death penalty.").[21]

The RJA, to be sure, has a procedural component in that it directs the trier of fact to assess whether the processes used in sentencing the defendants to death were tainted by racial considerations. But as the Supreme Court made clear in *Montgomery v. Louisiana*, 136 S.Ct. 718 (2016), this "procedural requirement" – a capital trial free of racial taint – merely "implements" the RJA's "substantive guarantee."[22] The state trial court's substantive findings under the RJA in

---

[21] *Cf. Bobby v. Bies*, 556 U.S. 825, 833-34 (2009) (denying double jeopardy protection because there was no finding entitling the defendant to a life sentence under state law); *Poland v. Arizona*, 476 U.S. 147, 155-157 (1986) (neither judge nor jury "acquitted' the defendant because neither made findings sufficient to establish legal entitlement to a life sentence); *Sattazahn v. Pennsylvania*, 537 U.S. 101, 108-10 (2003) (judge did not enter "findings sufficient to establish legal entitlement to the life sentence.").

[22] In *Montgomery*, the Court considered whether its decision in *Miller v. Alabama*, 132 S.Ct. 2455 (2012), which "required that sentencing courts consider a child's 'diminished culpability and heightened capacity for change' before condemning him or her to die in prison," announced a substantive or procedural rule. *Montgomery*, 136 S.Ct. at 726-727, quoting 132 S.Ct. at 2469. The Court explained that "[s]ubstantive rules include . . . 'rules forbidding a certain category of punishment for a class of defendants because of their status or offense.'" 136 S.Ct. at 728, quoting *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989). It held that "[u]nder this standard, … *Miller* announced a substantive rule" because it "rendered life without parole an unconstitutional penalty for a class of defendants because of their status – that is, juvenile offenders whose crimes reflect the transient immaturity of youth." 136 S.Ct. at 732, 734 (citations and internal quotation marks omitted). The Court acknowledged that "*Miller's* holding has a procedural component," but explained that the decision merely established "a

Petitioners' cases are thus protected by the Double Jeopardy Clause, and may not constitutionally be subject to further proceedings in the trial court. For these reasons, Petitioners' habeas petitions should be granted.

<u>**CONCLUSION**</u>

Petitioners request that the Court conduct oral argument on the issues raised. Petitioners further request that the Court grant a certificate of appealability, and issue a writ of habeas corpus on the basis that the Double Jeopardy Clause requires that Petitioners be remanded to state custody pursuant to the life imprisonment judgments imposed by the state trial court following their RJA trials.

Respectfully submitted, this the 25th day of July 2016.

<u>/s/ Donald H. Beskind</u>                    <u>/s/ David Weiss</u>
Donald H. Beskind                              David Weiss
N.C. State Bar No. 8138                        N.C. State Bar No. 35647
Duke University School of Law                  Center for Death Penalty Litigation
Box 90360                                      123 W. Main Street, Suite 700
Durham, NC 27708                               Durham, NC 27701
Beskind@law.duke.edu                           dcweiss@cdpl.org
(919) 613-7085                                 (919) 956-9545

*Counsel for Marcus Reymond Robinson*

---

procedural requirement necessary to implement [its] substantive guarantee." *Id*. at 734-735.

<u>/s/ Kenneth J. Rose</u>
Kenneth J. Rose
N.C. State Bar No. 17208
Center for Death Penalty Litigation
123 W. Main Street, Suite 700
Durham, NC 27701
ken@cdpl.org
(919) 956-9545

*Counsel for Tilmon C. Golphin*

<u>/s/ Jay H. Ferguson</u>
Jay H. Ferguson
N.C. State Bar No. 16624
Thomas, Ferguson & Mullins, LLP
119 East Main Street
Durham, NC 27701
ferguson@tfmattorneys.com
(919) 682-5648

## **CERTIFICATE OF COMPLIANCE**

This brief has been prepared using fourteen point, proportionally spaced, Times New Roman typeface. The software version used was Microsoft Word 2016.

Exclusive of the table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules or regulations; and the certificate of service, the brief contains 10,583 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.


July 25, 2016                              /s/David Weiss
                                          David Weiss

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing Brief of Petitioner-Appellant with the Clerk of Court using the CM/ECF system, and through which the same was electronically mailed to:

> Danielle Marquis Elder
> Special Deputy Attorney General
> dmarquis@ncdoj.gov
>
> Jonathan P. Babb
> Special Deputy Attorney General
> jbabb@ncdoj.gov
>
> Attorney General of North Carolina
> North Carolina Department of Justice
> P.O. Box 629
> Raleigh, NC 27602
> (919) 716-6500

This the 25th day of July 2016.

> <u>/s/ David Weiss</u>
> David Weiss

## **<u>ADDENDUM</u>**

General Assembly of North Carolina Session Law 2009-464...................................1

General Assembly of North Carolina Session Law 2012-136...................................4

General Assembly of North Carolina Session Law 2013-154...................................7

# GENERAL ASSEMBLY OF NORTH CAROLINA
## SESSION 2009

### SESSION LAW 2009-464
### SENATE BILL 461

AN ACT TO PROHIBIT SEEKING OR IMPOSING THE DEATH PENALTY ON THE BASIS OF RACE; TO ESTABLISH A PROCESS BY WHICH RELEVANT EVIDENCE MAY BE USED TO ESTABLISH THAT RACE WAS A SIGNIFICANT FACTOR IN SEEKING OR IMPOSING THE DEATH PENALTY WITHIN THE COUNTY, THE PROSECUTORIAL DISTRICT, THE JUDICIAL DIVISION, OR THE STATE, TO IDENTIFY TYPES OF EVIDENCE THAT MAY BE CONSIDERED BY THE COURT WHEN CONSIDERING WHETHER RACE WAS A BASIS FOR SEEKING OR IMPOSING THE DEATH PENALTY, INCLUDING STATISTICAL EVIDENCE, AND TO AUTHORIZE THE DEFENDANT TO RAISE THIS CLAIM AT THE PRETRIAL CONFERENCE OR IN POSTCONVICTION PROCEEDINGS; TO PROVIDE THAT THE DEFENDANT HAS THE BURDEN OF PROVING THAT RACE WAS A SIGNIFICANT FACTOR IN SEEKING OR IMPOSING THE DEATH PENALTY AND TO PROVIDE THAT THE STATE MAY OFFER EVIDENCE TO REBUT THE CLAIMS OR EVIDENCE OF THE DEFENDANT AND IN DOING SO TO USE STATISTICAL EVIDENCE AS WELL AS ANY OTHER EVIDENCE THE COURT DEEMS RELEVANT AND MATERIAL; TO PROVIDE THAT IF RACE IS FOUND TO BE A SIGNIFICANT FACTOR IN THE IMPOSITION OF THE DEATH PENALTY, THE DEATH SENTENCE SHALL BE VACATED AND THE DEFENDANT RESENTENCED TO LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE; TO PROVIDE THAT THIS ACT IS EFFECTIVE WHEN IT BECOMES LAW AND APPLIES RETROACTIVELY, THAT MOTIONS UNDER THIS ACT FOR THOSE CURRENTLY UNDER A DEATH SENTENCE SHALL BE FILED WITHIN ONE YEAR OF THE EFFECTIVE DATE OF THIS ACT, AND THAT MOTIONS FOR THOSE WHOSE DEATH SENTENCE IS IMPOSED ON OR AFTER THE EFFECTIVE DATE OF THIS ACT SHALL BE FILED AS PROVIDED IN THIS ACT.

The General Assembly of North Carolina enacts:

**SECTION 1.**  Chapter 15A of the General Statutes is amended by adding a new Article to read:

"Article 101.
"North Carolina Racial Justice Act.
"**§ 15A-2010.  North Carolina Racial Justice Act.**
No person shall be subject to or given a sentence of death or shall be executed pursuant to any judgment that was sought or obtained on the basis of race.
"**§ 15A-2011.  Proof of racial discrimination.**
(a)    A finding that race was the basis of the decision to seek or impose a death sentence may be established if the court finds that race was a significant factor in decisions to seek or impose the sentence of death in the county, the prosecutorial district, the judicial division, or the State at the time the death sentence was sought or imposed.
(b)    Evidence relevant to establish a finding that race was a significant factor in decisions to seek or impose the sentence of death in the county, the prosecutorial district, the


ADD-1

judicial division, or the State at the time the death sentence was sought or imposed may include statistical evidence or other evidence, including, but not limited to, sworn testimony of attorneys, prosecutors, law enforcement officers, jurors, or other members of the criminal justice system or both, that, irrespective of statutory factors, one or more of the following applies:

    (1)    Death sentences were sought or imposed significantly more frequently upon persons of one race than upon persons of another race.

    (2)    Death sentences were sought or imposed significantly more frequently as punishment for capital offenses against persons of one race than as punishment of capital offenses against persons of another race.

    (3)    Race was a significant factor in decisions to exercise peremptory challenges during jury selection.

A juror's testimony under this subsection shall be consistent with Rule 606(b) of the North Carolina Rules of Evidence, as contained in G.S. 8C-1.

(c)    The defendant has the burden of proving that race was a significant factor in decisions to seek or impose the sentence of death in the county, the prosecutorial district, the judicial division, or the State at the time the death sentence was sought or imposed. The State may offer evidence in rebuttal of the claims or evidence of the defendant, including statistical evidence. The court may consider evidence of the impact upon the defendant's trial of any program the purpose of which is to eliminate race as a factor in seeking or imposing a sentence of death.

"**§ 15A-2012.  Hearing procedure.**

(a)    The defendant shall state with particularity how the evidence supports a claim that race was a significant factor in decisions to seek or impose the sentence of death in the county, the prosecutorial district, the judicial division, or the State at the time the death sentence was sought or imposed.

    (1)    The claim shall be raised by the defendant at the pretrial conference required by Rule 24 of the General Rules of Practice for the Superior and District Courts or in postconviction proceedings pursuant to Article 89 of Chapter 15A of the General Statutes.

    (2)    The court shall schedule a hearing on the claim and shall prescribe a time for the submission of evidence by both parties.

    (3)    If the court finds that race was a significant factor in decisions to seek or impose the sentence of death in the county, the prosecutorial district, the judicial division, or the State at the time the death sentence was sought or imposed, the court shall order that a death sentence not be sought, or that the death sentence imposed by the judgment shall be vacated and the defendant resentenced to life imprisonment without the possibility of parole.

(b)    Notwithstanding any other provision or time limitation contained in Article 89 of Chapter 15A of the General Statutes, a defendant may seek relief from the defendant's death sentence upon the ground that racial considerations played a significant part in the decision to seek or impose a death sentence by filing a motion seeking relief.

(c)    Except as specifically stated in subsections (a) and (b) of this section, the procedures and hearing on the motion seeking relief from a death sentence upon the ground that race was a significant factor in decisions to seek or impose the sentence of death in the county, the prosecutorial district, the judicial division, or the State at the time the death sentence was sought or imposed shall follow and comply with G.S. 15A-1420, 15A-1421, and 15A-1422."

**SECTION 2.** This act is effective when it becomes law and applies retroactively. For persons under a death sentence imposed before the effective date of this act, motions under this act shall be filed within one year of the effective date of this act; for persons whose death sentence is imposed on or after the effective date of this act, motions shall be filed as provided in this act.

In the General Assembly read three times and ratified this the 6th day of August, 2009.

s/  Marc Basnight
    President Pro Tempore of the Senate


s/  Joe Hackney
    Speaker of the House of Representatives


s/  Beverly E. Perdue
    Governor


Approved 11:40 a.m. this 11th day of August, 2009

ADD-3

GENERAL ASSEMBLY OF NORTH CAROLINA
SESSION 2011

SESSION LAW 2012-136
SENATE BILL 416

AN ACT TO AMEND DEATH PENALTY PROCEDURES.

The General Assembly of North Carolina enacts:

**SECTION 1.** G.S. 15-188 reads as rewritten:
"**§ 15-188. Manner and place of execution.**
    In accordance with G.S. 15-187, the mode of executing a death sentence must in every case be by administering to the convict or felon a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic agent until the convict or felon is dead; and when any person, convict or felon shall be sentenced by any court of the State having competent jurisdiction to be so executed, the punishment shall only be inflicted within a permanent death chamber which the superintendent of the State penitentiary is hereby authorized and directed to provide within the walls of the North Carolina penitentiary at Raleigh, North Carolina. The superintendent of the State penitentiary shall also cause to be provided, in conformity with this ~~Article~~ Article, ~~and approved by the Governor and Council of State,~~ the necessary appliances for the infliction of the punishment of death and qualified personnel to set up and prepare the injection, administer the preinjections, insert the IV catheter, and to perform other tasks required for this procedure in accordance with the requirements of this Article."
    **SECTION 2.** G.S. 15A-2004(b) reads as rewritten:
    "(b)    A sentence of death may not be imposed upon a defendant convicted of a capital felony unless the State has given notice of its intent to seek the death penalty. Notice of intent to seek the death penalty shall be given to the defendant and filed with the court on or before the date of the pretrial conference in capital cases required by Rule 24 of the General Rules of Practice for the Superior and District Courts, or the arraignment, whichever is later. <u>A court may discipline or sanction the State for failure to comply with the time requirements in Rule 24, but shall not declare a case as noncapital as a consequence of such failure. In addition to any discipline or sanctions the court may impose, the court shall continue the case for a sufficient time so that the defendant is not prejudiced by any delays in holding the hearing required by Rule 24.</u>"
    **SECTION 3.** G.S. 15A-2011 reads as rewritten:
"**§ 15A-2011.  Proof of racial ~~discrimination.~~<u>discrimination; hearing procedure.</u>**
    (a)    A finding that race was the basis of the decision to seek or impose a death sentence may be established if the court finds that race was a significant factor in decisions to seek or impose the <u>death penalty in the defendant's case at the time the death sentence was sought or imposed. For the purposes of this section, "at the time the death sentence was sought or imposed" shall be defined as the period from 10 years prior to the commission of the offense to the date that is two years after the imposition of the death sentence.</u> ~~sentence of death in the county, the prosecutorial district, the judicial division, or the State at the time the death sentence was sought or imposed.~~
    <u>(a1)    It is the intent of this Article to provide for an amelioration of the death sentence. It shall be a condition for the filing and consideration of a motion under this Article that the defendant knowingly and voluntarily waives any objection to the imposition of a sentence to life imprisonment without parole based upon any common law, statutory law, or the federal or State constitutions that would otherwise require that the defendant be eligible for parole. The waiver shall be in writing, signed by the defendant, and included in the motion seeking relief under this Article. If the court determines that a hearing is required pursuant to subdivision (3) of subsection (f) of this section, the court shall make an oral inquiry of the defendant to confirm the defendant's waiver, which shall be part of the record. If the court grants relief under this</u>

Article, the judgment shall include a finding that the defendant waived any objection to the imposition of a sentence of life imprisonment without parole.

~~(b)    Evidence relevant to establish a finding that race was a significant factor in decisions to seek or impose the sentence of death in the county, the prosecutorial district, the judicial division, or the State at the time the death sentence was sought or imposed may include statistical evidence or other evidence, including, but not limited to, sworn testimony of attorneys, prosecutors, law enforcement officers, jurors, or other members of the criminal justice system or both, that, irrespective of statutory factors, one or more of the following applies:~~

~~(1)    Death sentences were sought or imposed significantly more frequently upon persons of one race than upon persons of another race.~~

~~(2)    Death sentences were sought or imposed significantly more frequently as punishment for capital offenses against persons of one race than as punishment of capital offenses against persons of another race.~~

~~(3)    Race was a significant factor in decisions to exercise peremptory challenges during jury selection.~~

~~A juror's testimony under this subsection shall be consistent with Rule 606(b) of the North Carolina Rules of Evidence, as contained in G.S. 8C-1.~~

(c)    The defendant has the burden of proving that race was a significant factor in decisions to seek or impose the sentence of death in the ~~county, the prosecutorial district, the judicial division, or the State~~ county or prosecutorial district at the time the death sentence was sought or imposed. The State may offer evidence in rebuttal of the claims or evidence of the defendant, including statistical evidence. The court may consider evidence of the impact upon the defendant's trial of any program the purpose of which is to eliminate race as a factor in seeking or imposing a sentence of death.

(d)    Evidence relevant to establish a finding that race was a significant factor in decisions to seek or impose the sentence of death in the county or prosecutorial district at the time the death sentence was sought or imposed may include statistical evidence derived from the county or prosecutorial district where the defendant was sentenced to death, or other evidence, that either (i) the race of the defendant was a significant factor or (ii) race was a significant factor in decisions to exercise peremptory challenges during jury selection. The evidence may include, but is not limited to, sworn testimony of attorneys, prosecutors, law enforcement officers, judicial officials, jurors, or others involved in the criminal justice system. A juror's testimony under this subsection shall be consistent with Rule 606(b) of the North Carolina Rules of Evidence, as contained in G.S. 8C-1.

(e)    Statistical evidence alone is insufficient to establish that race was a significant factor under this Article. The State may offer evidence in rebuttal of the claims or evidence of the defendant, including, but not limited to, statistical evidence.

(f)    In any motion filed under this Article, the defendant shall state with particularity how the evidence supports a claim that race was a significant factor in decisions to seek or impose the sentence of death in the defendant's case in the county or prosecutorial district at the time the death sentence was sought or imposed.

(1)    The claim shall be raised by the defendant at the pretrial conference required by the General Rules of Practice for the Superior and District Courts or in postconviction proceedings pursuant to Article 89 of Chapter 15A of the General Statutes.

(2)    If the court finds that the defendant's motion fails to state a sufficient claim under this Article, then the court shall dismiss the claim without an evidentiary hearing.

(3)    If the court finds that the defendant's motion states a sufficient claim under this Article, the court shall schedule a hearing on the claim and may prescribe a time prior to the hearing for each party to present a forecast of its proposed evidence.

(g)    If the court finds that race was a significant factor in decisions to seek or impose the sentence of death in the defendant's case at the time the death sentence was sought or imposed, the court shall order that a death sentence not be sought, or that the death sentence imposed by the judgment be vacated and the defendant resentenced to life imprisonment without the possibility of parole."

**SECTION 4.**  G.S. 15A-2012 is repealed.

**SECTION 5.**  This act does not change any provision in Article 89 of Chapter 15A of the General Statutes concerning the procedure for the filing of motions for appropriate relief in capital cases, including the deadlines and grounds upon which a motion may be filed.

**SECTION 6.**  Unless otherwise excepted, this act, including the hearing procedure, evidentiary burden, and the description of evidence that is relevant to a finding that race was a significant factor in seeking or imposing a death sentence, also applies to any postconviction motions for appropriate relief that were filed pursuant to S.L. 2009-464. This act also applies to any hearing that commenced prior to the effective date of this act. A person who filed a postconviction motion for appropriate relief pursuant to S.L. 2009-464 shall have 60 days from the effective date of this act to amend or otherwise modify the motion. Any hearings commenced prior to the effective date shall be continued and shall not be set to reconvene on a date less than 60 days from the effective date of this act.

**SECTION 7.**  This act does not provide, allow, or authorize any motions for appropriate relief in addition to those already authorized under laws applicable to capital trial procedure or Article 89 of Chapter 15A of the General Statutes. A capital defendant who filed a trial motion alleging discrimination, or a motion for appropriate relief alleging discrimination, prior to or following the effective date of S.L. 2009-464 is not entitled or authorized to file any additional motions for appropriate relief based upon this act.

**SECTION 8.**  This act does not apply to a postconviction motion for appropriate relief which was filed pursuant to S.L. 2009-464 if the court, prior to the effective date of this act, made findings of fact and conclusions of law after an evidentiary hearing in which the person seeking relief and the State had an opportunity to present evidence, including witness testimony and rebuttal evidence. If, however, an order by a trial court which would otherwise meet the requirements of this section is vacated or overturned upon appellate review, then any further proceedings required to prove a claim that racial discrimination was a significant factor in seeking or imposing the death penalty shall be subject to the provisions of this act.

**SECTION 9.**  If any provision of this act or its application is held invalid, the invalidity does not affect other provisions or applications of this act that can be given effect without the invalid provisions or application, and to this end the provisions of this act are severable.

**SECTION 10.**  Section 1 of this act is applicable for executions scheduled after the effective date of this act.  Section 2 of this act is effective for Rule 24 hearings scheduled on or after the effective date of this act.  The remainder of this act is effective when it becomes law and applies to all capital trials held prior to, on, or after the effective date of this act and to all capital defendants sentenced to the death penalty prior to, on, or after the effective date of this act.

In the General Assembly read three times and ratified this the 21st day of June, 2012.


s/  Walter H. Dalton
      President of the Senate


s/  Thom Tillis
      Speaker of the House of Representatives


VETO   Beverly E. Perdue
      Governor


Became law notwithstanding the objections of the Governor at 2:30 p.m. this 2nd day of July, 2012.


s/  Denise Weeks
      House of Representatives Principal Clerk

# GENERAL ASSEMBLY OF NORTH CAROLINA
## SESSION 2013

### SESSION LAW 2013-154
### SENATE BILL 306

AN ACT TO EXCLUDE THE ADMINISTRATION OF A LETHAL INJECTION FROM THE PRACTICE OF MEDICINE; TO CODIFY THE LAW THAT PROHIBITS REGULATORY BOARDS FROM SANCTIONING HEALTH CARE PROFESSIONALS FOR ASSISTING IN THE EXECUTION PROCESS; TO AMEND THE LAW ON THE ADMINISTRATION OF A LETHAL INJECTION; TO REQUIRE THE SETTING OF AN EXECUTION DATE IF ANY OF THE EVENTS WHICH ARE PROVIDED BY STATUTE HAVE OCCURRED; TO ELIMINATE THE PROCESS BY WHICH A DEFENDANT MAY USE STATISTICS TO HAVE A SENTENCE OF DEATH REDUCED TO LIFE IN PRISON WITHOUT PAROLE; TO REQUIRE PERIODIC REPORTS ON THE TRAINING AND AVAILABILITY OF PERSONNEL TO CARRY OUT A DEATH SENTENCE; AND TO REQUIRE PERIODIC REPORTS ON THE STATUS OF PENDING POSTCONVICTION CAPITAL CASES.

The General Assembly of North Carolina enacts:

**SECTION 1.(a)**  Article 19 of Chapter 15 of the General Statutes is amended by adding a new section to read:
"**§ 15-188.1.  Health care professional assistance.**
(a)      Any assistance rendered with an execution under this Article by any licensed health care professional, including, but not limited to, physicians, nurses, and pharmacists, shall not be cause for any disciplinary or corrective measures by any board, commission, or other authority created by the State or governed by State law which oversees or regulates the practice of health care professionals, including, but not limited to, the North Carolina Medical Board, the North Carolina Board of Nursing, and the North Carolina Board of Pharmacy.
(b)      The infliction of the punishment of death by administration of the required lethal substances under this Article shall not be construed to be the practice of medicine."
**SECTION 1.(b)**  G.S. 90-1.1(5) reads as rewritten:
"(5)      The practice of medicine or surgery. – The Except as otherwise provided by this subdivision, the practice of medicine or surgery, for purposes of this Article, includes any of the following acts:
    a.      Advertising, holding out to the public, or representing in any manner that the individual is authorized to practice medicine in this State.
    b.      Offering or undertaking to prescribe, order, give, or administer any drug or medicine for the use of any other individual.
    c.      Offering or undertaking to prevent or diagnose, correct, prescribe for, administer to, or treat in any manner or by any means, methods, or devices any disease, illness, pain, wound, fracture, infirmity, defect, or abnormal physical or mental condition of any individual, including the management of pregnancy or parturition.
    d.      Offering or undertaking to perform any surgical operation on any individual.
    e.      Using the designation "Doctor," "Doctor of Medicine," "Doctor of Osteopathy," "Doctor of Osteopathic Medicine," "Physician," "Surgeon," "Physician and Surgeon," "Dr.," "M.D.," "D.O.," or any combination thereof in the conduct of any occupation or profession pertaining to the prevention, diagnosis, or treatment of human disease or condition, unless the designation additionally contains the description of or reference to another branch of the healing arts for



which the individual holds a valid license in this State or the use of the designation "Doctor" or "Physician" is otherwise specifically permitted by law.

f.    The performance of any act, within or without this State, described in this subdivision by use of any electronic or other means, including the Internet or telephone.

The administration of required lethal substances or any assistance whatsoever rendered with an execution under Article 19 of Chapter 15 of the General Statutes does not constitute the practice of medicine or surgery."

**SECTION 1.(c)**  G.S. 90-85.38(b) reads as rewritten:

"(b)    The Board, in accordance with Chapter 150B of the General Statutes, may suspend, revoke, or refuse to grant or renew any permit for the same conduct as stated in subsection (a). The administration of required lethal substances or any assistance whatsoever rendered with an execution under Article 19 of Chapter 15 of the General Statutes does not constitute the practice of pharmacy under this Article, and any assistance rendered with an execution under Article 19 of Chapter 15 of the General Statutes shall not be the cause for disciplinary action under this Article."

**SECTION 1.(d)**  G.S. 90-171.20(4) reads as rewritten:

"(4)    "Nursing" is a dynamic discipline which includes the assessing, caring, counseling, teaching, referring and implementing of prescribed treatment in the maintenance of health, prevention and management of illness, injury, disability or the achievement of a dignified death. It is ministering to; assisting; and sustained, vigilant, and continuous care of those acutely or chronically ill; supervising patients during convalescence and rehabilitation; the supportive and restorative care given to maintain the optimum health level of individuals, groups, and communities; the supervision, teaching, and evaluation of those who perform or are preparing to perform these functions; and the administration of nursing programs and nursing services. For purposes of this Article, the administration of required lethal substances or any assistance whatsoever rendered with an execution under Article 19 of Chapter 15 of the General Statutes does not constitute nursing."

**SECTION 2.**  G.S. 15-194 reads as rewritten:

"**§ 15-194. Time for execution.**

(a)    In sentencing a capital defendant to a death sentence pursuant to G.S. 15A-2000(b), the sentencing judge need not specify the date and time the execution is to be carried out by the Division of Adult Correction of the Department of Public Safety. ~~The Secretary of Public Safety shall immediately schedule a date for the execution of the original death sentence not less than 30 days nor more than 60 days from the date of receiving written notification from the Attorney General of North Carolina or the district attorney who prosecuted the case of any one of the following:~~ The Attorney General of North Carolina shall provide written notification to the Secretary of the Department of Public Safety of the occurrence of any of the following not more than 90 days from that occurrence:

(1)    The United States Supreme Court has filed an opinion upholding the sentence of death following completion of the initial State and federal postconviction proceedings, if any;

(2)    The mandate issued by the Supreme Court of North Carolina on direct appeal pursuant to N.C.R. App. P. 32(b) affirming the capital defendant's death sentence and the time for filing a petition for writ of certiorari to the United States Supreme Court has expired without a petition being filed;

(3)    The capital defendant, if indigent, failed to timely seek the appointment of counsel pursuant to G.S. 7A-451(c), or failed to file a timely motion for appropriate relief as required by G.S. 15A-1415(a);

(4)    The superior court denied the capital defendant's motion for appropriate relief, but the capital defendant failed to file a timely petition for writ of certiorari to the Supreme Court of North Carolina pursuant to N.C.R. App. P. 21(f);

(5)    The Supreme Court of North Carolina denied the capital defendant's petition for writ of certiorari pursuant to N.C.R. App. P. 21(f), or, if certiorari was granted, upheld the capital defendant's death sentence, but the capital

defendant failed to file a timely petition for writ of certiorari to the United States Supreme Court; or

(6)    Following State postconviction proceedings, if any, the capital defendant failed to file a timely petition for writ of habeas corpus in the appropriate federal district court, or failed to timely appeal or petition an adverse habeas corpus decision to the United States Court of Appeals for the Fourth Circuit or the United States Supreme Court.

The Secretary of the Department of Public Safety shall immediately schedule a date for the execution of the original death sentence not less than 15 days or more than 120 days from the date of receiving written notification from the Attorney General under this section.

The Secretary shall send a certified copy of the document fixing the date to the clerk of superior court of the county in which the case was tried or, if venue was changed, in which the defendant was indicted. The certified copy shall be recorded in the minutes of the court. The Secretary shall also send certified copies to the capital defendant, the capital defendant's attorney, the district attorney who prosecuted the case, and the Attorney General of North Carolina.

(b)    The Attorney General shall submit a written report to the Joint Legislative Oversight Committee on Justice and Public Safety by April 1, 2014, and thereafter on October 1 of each year, on the status of all pending postconviction capital cases. Alternatively, the Chairs of the Joint Legislative Oversight Committee on Justice and Public Safety may direct that the reports required under this subsection be made on other dates consistent with the Committee's schedule."

**SECTION 3.(a)**  G.S. 15-188 reads as rewritten:

"**§ 15-188.  Manner and place of execution.**

In accordance with G.S. 15-187, the mode of executing a death sentence must in every case be by administering to the convict or felon ~~a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic agent until the convict or felon is dead;~~ an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until the person is dead, and that procedure shall be determined by the Secretary of the Department of Public Safety, who shall ensure compliance with the federal and State constitutions; and when any person, convict or felon shall be sentenced by any court of the State having competent jurisdiction to be so executed, the punishment shall only be inflicted within a permanent death chamber which the superintendent of the State penitentiary is hereby authorized and directed to provide within the walls of the North Carolina penitentiary at Raleigh, North Carolina. The superintendent of the State penitentiary shall also cause to be provided, in conformity with this Article, the necessary appliances for the infliction of the punishment of death and qualified personnel to set up and prepare the injection, administer the preinjections, insert the IV catheter, and to perform other tasks required for this procedure in accordance with the requirements of this Article."

**SECTION 3.(b)**  Procedures and substances utilized to carry out a death sentence in place before the effective date of this act are not abated or affected by this act; however, it shall be within the discretion of the Secretary whether to continue, change, or modify such procedures or substances as authorized by law.

**SECTION 4.**  G.S. 15-190 reads as rewritten:

"**§ 15-190.  Person or persons to be designated by warden to execute sentence; supervision of execution; who shall be present.**

(a)    Some guard or guards or other reliable person or persons to be named and designated by the warden from time to time shall cause the person, convict or felon against whom the death sentence has been so pronounced to be executed as provided by this Article and all amendments thereto. The execution shall be under the general supervision and control of the warden of the penitentiary, who shall from time to time, in writing, name and designate the guard or guards or other reliable person or persons who shall cause the person, convict or felon against whom the death sentence has been pronounced to be executed as provided by this Article and all amendments thereto. At such execution there shall be present the warden or deputy warden or some person designated by the warden in the warden's place, and ~~the surgeon or physician of the penitentiary.~~ a licensed physician. Four respectable citizens, two members of the victim's family, the counsel and any relatives of such person, convict or felon and a minister or member of the clergy or religious leader of the person's choosing may be present if they so desire. The identities, including the names, residential addresses, residential telephone

numbers, and social security numbers, of witnesses or persons designated to carry out the execution shall be confidential and exempted from Chapter 132 of the General Statutes and are not subject to discovery or introduction as evidence in any proceeding. The Senior Resident Superior Court Judge for Wake County may order disclosure of names made confidential by this section after making findings that support a conclusion that disclosure is necessary to a proper administration of justice.

(b)     The warden shall report to the Joint Legislative Oversight Committee on Justice and Public Safety by April 1, 2014, and thereafter on October 1 of each year, on the status of the persons required by subsection (a) of this section to be named and designated by the warden to execute death sentences under this Article. The report shall confirm that the required persons are properly trained and ready to serve as an execution team. Alternatively, the Chairs of the Joint Legislative Oversight Committee on Justice and Public Safety may direct that the reports required under this subsection be made on other dates consistent with the Committee's schedule."

**SECTION 5.(a)**  Article 101 of Chapter 15A of the General Statutes is repealed.

**SECTION 5.(b)**  The intent and purpose of this section, and its sole effect, is to remove the use of statistics to prove purposeful discrimination in a specific case. Upon repeal of Article 101 of Chapter 15A of the General Statutes, a capital defendant retains all of the rights which the State and federal constitutions provide to ensure that the prosecutors who selected a jury and who sought a capital conviction did not do so on the basis of race, that the jury that hears his or her case is impartial, and that the trial was free from prejudicial error of any kind. These rights are protected through multiple avenues of appeal, including direct appeal to the North Carolina Supreme Court, and discretionary review to the United States Supreme Court; a postconviction right to file a motion for appropriate relief at the trial court level where claims of racial discrimination may be heard; and again at the federal level through a petition of habeas corpus. A capital defendant prior to the passage of Article 101 of Chapter 15A of the General Statutes had the right to raise the issue of whether a prosecutor sought the death penalty on the basis of race, whether the jury was selected on the basis of race, or any other matter which evidenced discrimination on the basis of race. All these same rights, existing prior to the enactment of Article 101 of Chapter 15A of the General Statutes, remain the law of this State after its repeal.

**SECTION 5.(c)**  Upon request of a district attorney, the Attorney General shall assume primary responsibility on behalf of that district attorney for the litigation in superior court or an appellate court of any claims or issues resulting from a petition for relief that has been or may be filed under the provisions of Article 101 of Chapter 15A of the General Statutes or any issues or matters relating to the repeal of Article 101 of Chapter 15A of the General Statutes, as provided in this act.

**SECTION 5.(d)**  Except as otherwise provided in this subsection, this section is retroactive and applies to any motion for appropriate relief filed pursuant to Article 101 of Chapter 15A of the General Statutes prior to the effective date of this act. All motions filed pursuant to Article 101 of Chapter 15A of the General Statutes prior to the effective date of this act are void. This section does not apply to a court order resentencing a petitioner to life imprisonment without parole pursuant to the provisions of Article 101 of Chapter 15A of the General Statutes prior to the effective date of this act if the order is affirmed upon appellate review and becomes a final Order issued by a court of competent jurisdiction. This section is applicable in any case where a court resentenced a petitioner to life imprisonment without parole pursuant to the provisions of Article 101 of Chapter 15A of the General Statutes prior to the effective date of this act, and the Order is vacated upon appellate review by a court of competent jurisdiction.

ADD-10

**SECTION 6.** This act is effective when it becomes law.

In the General Assembly read three times and ratified this the 13th day of June, 2013.

s/ Daniel J. Forest
President of the Senate

s/ Thom Tillis
Speaker of the House of Representatives

s/ Pat McCrory
Governor

Approved 4:27 p.m. this 19th day of June, 2013

ADD-11